**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------

MARK WALSIFER,                            :
                                          :
            Plaintiff,          :          Civ. No. 04-5393 (DRD)
                                          :
        v.                      :
                                          :
BOROUGH OF BELMAR, BOROUGH   :          **O P I N I O N**
OF BELMAR POLICE DEPARTMENT, :
and RICHARD LYNCH,              :
                                          :
            Defendants.         :
                                          :

-------------------------------------------------------

Charles J. Sciarra, Esq.
SCIARRA & CASTRAMBONE, LLC
1130 Clifton Avenue
Clifton, New Jersey 07013

*Attorneys for Plaintiff Mark Walsifer*

Arthur R. Thibault, Jr., Esq.
APRUZZESE, MCDERMOTT, MASTRO & MURPHY, P.C.
25 Independence Boulevard
P.O. Box 112
Liberty Corner, New Jersey 07938

*Attorneys for Defendants Borough of Belmar, Borough of Belmar Police Department, and Richard Lynch*

**<u>DEBEVOISE, Senior District Judge</u>**

## I.  <u>PROCEDURAL HISTORY</u>

1

Plaintiff Mark Walsifer ("Plaintiff") filed a complaint against defendants Borough of Belmar (the "Borough" or "Belmar"), Borough of Belmar Police Department (the "Department"), and Richard Lynch ("Lynch") (collectively, "Defendants") alleging violations of Plaintiff's rights in association with his employment with the Department (the "Complaint"). The Complaint alleges the following counts: (1) Count One- violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and the New Jersey Constitution, in violation of 42 U.S.C. § 1983; (2) Count Two- violation of Plaintiff's equal protection rights under the Fourteenth Amendment to the United States Constitution and Article I, Paragraph I of the New Jersey State Constitution, in violation of 42 U.S.C. § 1983; and (3) Count Three- breach of stipulation of settlement. Plaintiff and Defendants now move for summary judgment on all counts of the Complaint. The court will deny Plaintiff's motion for summary judgment; it will grant Defendants' motion for summary judgment on Counts One and Two and exercise its discretion pursuant to 28 U.S.C. § 1367(c)(3) to dismiss Count Three without prejudice.

## II. <u>BACKGROUND</u>

The following facts are undisputed by the parties.

### A. <u>The Parties</u>

Plaintiff has been a Belmar police officer since March of 1991. Plaintiff is a patrol officer, but is presently assigned to the Detective Bureau. Plaintiff is also president of the Belmar Republican Club. As president, Plaintiff is involved in fund-raising activities for the Republican Party. In addition, Plaintiff is a municipal chair for the Monmouth County Republicans. In this capacity, Plaintiff has assisted the Republican Party steering committee.

Plaintiff is also president of the local Police Benevolent Association union and has been a board member of the Belmar Board of Education since 1999.

The Belmar Police Department is a small police department comprised of twenty-one permanent police officers. However, between May and September, Belmar employs approximately sixty additional special police officers.

Defendant Lynch was the Belmar Chief of Police starting in or about 1994, and he retired on or about October 1, 2003.[1] Lynch also served as the Borough Administrator from 2002 until July 1, 2005. He was appointed by Belmar Mayor Kenneth Pringle ("Pringle") and the Borough Council.[2] As Borough Administrator, Lynch met with the department heads to discuss the business of the Borough. Lynch oversaw the day-to-day functions of the Borough and is in charge of personnel under that "umbrella".

## B.  The Prior Litigation and Settlement

A previous lawsuit was filed by Plaintiff and his brother, Nicholas Walsifer, in this court against the Borough, the Department, Lynch, and Pringle. In that action Plaintiff alleged that he had been discriminated and retaliated against because of his political activities as a Republican in a primarily Democratic town. On July 17, 2002, the parties in the previous lawsuit entered into a stipulation of settlement (the "Stipulation of Settlement"). The Stipulation of Settlement provided in part:

---

[1]Jack Hill ("Hill") was made acting Chief of Police in January 2003 and replaced Lynch as the permanent Chief of Police in September 2003.

[2]The Mayor and Borough Council promote the Belmar Chief of Police. In 2003, the Mayor and Borough Council were Democrats.

> All disciplinary notices, actions, findings, decisions or anything regarding any disciplinary history at all . . . for Police Officers Mark Walsifer and Nicholas Walsifer are hereby removed and expunged from their files for the purpose of future disciplines, promotions or other career advancement opportunities.  All pending hearings, grievances, appeals of any and all disciplines shall be withdrawn by and between the parties, including any parties' claim for attorney's fees in relation thereto, at the time this Stipulation of Settlement is agreed upon by the parties . . .

Additionally, under the terms of the Stipulation of Settlement, the Defendants agreed to refer future disciplinary actions taken against Plaintiff to a neutral arbitrator**.**

**C.  The Use of Plaintiff's Disciplinary Record**

In the fall of 2003, Plaintiff applied for the position of sergeant.  At that time, Plaintiff was ranked number two on the Civil Service List (the "Sergeant List").  Plaintiff was not promoted to sergeant.  When asked why Plaintiff had not been promoted, Hill testified that Plaintiff's disciplinary record was a weak point.  Hill also testified that a handicap parking discipline, in which Plaintiff was disciplined, was part of what he looked at with regard to Plaintiffs' weak points.  Specifically, Hill testified:

> Q. Okay.  And before I asked about the prior discipline, I asked something about a handicap, getting a handicap?
>
> A. Right.
>
> Q. Is this the incident you're referring to?
>
> A. I believe so, yes.
>
> Q. And this was something to do with Walsifer's handling of obtaining a handicap parking permit?
>
> A. Yes.
>
> Q. So that someone could put some signs or whatever in front of their house?
>
> A. So a handicapped person would have access to space in front

4

of their house as allowed by state statute and borough ordinance.

Q.      Okay.  And this, on the first page, referring 01-5646 IA, that's the same thing with regard to the CAD for this particular incident being an internal affairs?

A.      Yes.

Q.      Okay.  And was this part of the disciplinaries that you looked at with regard to the weak points that you referred to earlier as it related to Walsifer's work record?

A.      Yes.

Plaintiff was disciplined with regard to this incident on January 14, 2002, prior to the July 17, 2002 Stipulation of Settlement.

As Chief of Police, Lynch testified that he maintained the disciplinary records of police officers in the Department.  Lynch kept the records in a locked file, and he and Nancy O'Donnell, his assistant, were the only ones who could access the records.  Lynch testified that he did not personally remove Plaintiff's disciplinary records and never verified whether Plaintiff's files were expunged.

In connection with a disciplinary action regarding "politicking", Hill wrote a report dated November 5, 2002 in which he referenced a discipline Plaintiff received on May 23, 2001.  Chief Hill testified that the discipline referenced in his November 5, 2002 report was not expunged from Plaintiff's file.  Hill further testified that he used the May 23, 2001 discipline to sustain a December 3, 2002 charge.

**D.  Letter Regarding Plaintiff's Position on Belmar's Board of Education**

On October 21, 2002, Hill forwarded a letter to the Monmouth County Prosecutor stating that the Department had a police officer who currently holds an elected position on Belmar's

Board of Education and requesting that the Prosecutor make a determination as to whether the elected position posed a conflict of interest in violation of the Attorney General's Model Rules and Regulations.  In that letter, Hill stated, "I personally believe that police officers involved in local political activities is detrimental to the good order and conduct of the Police Department and therefore should be restricted."  Although Hill was the President of the Democratic Club, he did not mention that in his letter.  Responding to the letter, Assistant Prosecutor Richard Incremona stated that Plaintiff's position did not violate any laws or policies.

**E.  December 3, 2002 Discipline for Politicking**

On December 3, 2002, Hill issued a Preliminary Notice of Disciplinary Action for "politicking" on duty and for failing to report his unit location.  This allegation surfaced while Plaintiff's father ran his mayoral campaign against the incumbent Democrat, Pringle.  An investigation was initiated when Lynch advised Hill that he had received a call from Pringle reporting that his father, Kenneth Pringle Sr. had observed the incident.  Hill did not interview Pringle, Kenneth Pringle Sr., or Lynch about the incident.

In the Preliminary Notice of Disciplinary Action, Hill alleged that on September 29, 2002, Plaintiff solicited an employee of a 7-11 convenience store to register to vote.  Additionally, Hill alleged that in August of 2002, Plaintiff solicited Belmar Police Officer Thomas Cox ("Cox") to register to vote by providing him with a voter registration form.  In the Preliminary Notice of Disciplinary Action , Hill sought a ten day suspension against Plaintiff.  However, an arbitrator ruled that Plaintiff receive counseling and a written reprimand.

**F.  Hill Letters Regarding Plaintiff's Performance**

On the night of July 1, 2003, Hill walked down to Ocean Avenue, where he allegedly observed juveniles engaged in minor violations.  Hill took issue with the fact that he did not observe any police units cruising Ocean Avenue to enforce laws.  Hill was unable to recall exactly how long he stood on Ocean Avenue that night but testified that he observed Ocean Avenue for approximately five minutes to an hour.

Hill wrote a letter to Plaintiff dated July 3, 2003 detailing Plaintiff's supposed deficiencies in supervising his shift, which was placed in his personnel file.  Plaintiff immediately responded to Hill's letter, denying that he failed to supervise his shift.  In another letter dated July 9, 2003 from Hill to Plaintiff, Hill requested answers to questions regarding Plaintiff's supervision.  Plaintiff responded to the Hill by letter dated July 9, 2003, addressing those questions.  Hill did not initiate an Internal Affairs investigation into either of the incidents.  At the time that Hill wrote the letters, he knew Plaintiff was ranked second on the Sergeant List.

## G.  The Sergeant List and the Promotion to Sergeant

On September 17, 2002, a sergeant's exam was administered.  On December 11, 2002, the original ranking on the certification of eligibility for appointment to the rank of police sergeant was published.[3]  Mike Sharin, who was suspended for four months, was ranked number one on the Sergeant List.  Plaintiff ranked number two, Plaintiff's brother Nick Walsifer was number three, and Cox was number four.  After an adjustment of the scores by the New Jersey Department of Personnel ("DOP"), Cox was tied for number three, and thus there were two persons in the number three spot.  The Civil Service statute allows a municipality to promote one person off a

---

[3]The Sergeant List was set to expire on December 18, 2005.

list of the top three prospective officers.

In January of 2003, Sergeant Fred Allen began contemplating retirement.  Hill informed Lynch that Mark and Nick Walsifer had placed high on the Sergeant List.  Chief Hill testified as follows:

> Q.  Do you recall [Lynch] having a negative opinion about them, them having been placed high on the list and the prospective that they may be appointed?
>
> A.  I would think that Dick Lynch would have a negative opinion about the Walsifers no matter when it was brought up. There's no need to ask or seek his opinion about Mark or Nick because you already know what his opinion is.

Hill also testified that Lynch was advised about Plaintiff's placement on the Sergeant List because of his position as Belmar's Business Administrator.

On July 1, 2003, Acting Business Administrator/Chief of Police Lynch, Acting Chief of Police Hill, Retired Captain Larry Winters and Cox played a round of golf.  That day was the only time Cox ever played with this foursome.

On August 7, 2003, Hill wrote a letter to the Belmar Borough Council requesting permission to make a promotion to sergeant.  Plaintiff understood Hill's letter as seeking permission to make a promotion to sergeant off the Sergeant List.  On September 9, 2003, Hill e-mailed Plaintiff, along with the other eligible officers on the Sergeant List, informing them that if they were interested in being considered for promotion, they had to send a letter of interest to the mayor.  Plaintiff sent a letter of interest to Pringle on September 10, 2003.  Hill then sent a letter to Plaintiff dated September 16, 2003 informing Plaintiff that he would be required to interview for the position.

As part of the promotional process, the chief of police puts forth a name for a promotion, and the Mayor and Borough Council vote on the nomination.  Hill and two councilmen, Jack Manutti ("Manutti") and John Szeliga ("Szeliga") interviewed the candidates for the sergeant position.[4]

Szeliga, who ran for political office on the Democratic ticket, was appointed to a vacant seat on the Borough Council by Mayor Pringle.  Manutti was elected as a Democrat.[5]  As part of the Public Safety Committee, Manutti and Szeliga were part of the promotional process.  The two councilmen and Hill interviewed the four police officers on the Sergeant List.  Hill testified that the two councilmen provided input, but it was Hill who made the recommendation to the Mayor and the Borough Council.  Hill informed Szeliga and Manutti about the disciplines of each candidate.  Specifically, Hill informed Szeliga and Manutti that Plaintiff was disciplined on July 3 and July 9, 2003.

Plaintiff was interviewed by Hill, Szeliga, and Manutti.  Plaintiff recalled questions about his involvement in the community, his thoughts of community policing, and how his co-workers viewed him.  Plaintiff could not recall any other specific questions.  Hill had drafted questions prior to interviewing the candidates, which covered a range of topics.  These questions were asked of all the candidates for promotion.  Both Szeliga and Manutti testified on deposition that Plaintiff interviewed badly and that Cox was clearly the superior candidate.  Cox also had a college degree, and Plaintiff did not.

---

[4]Cox testified that he was interviewed by Manutti and Szeliga, but did not remember whether there was a third person there or not.

[5]Manutti testified that he and Lynch are good friends.

Pursuant to the DOP regulations, Belmar had the discretion to select one of the top three individuals from the Sergeant List.  However, since two individuals were tied for third, the Borough had a choice among four officers for promotion to sergeant.  Ultimately, it was Hill's decision whom to recommend for promotion, and after the interviews, Hill made his recommendation to the Mayor and Borough Council that Cox should be promoted to the sergeant position.   Cox was promoted to sergeant on November 18, 2003.

### H.  The Officer in Charge Position

If a sergeant called out sick or took vacation, and there was no other sergeant working on that shift, the highest ranking police officer would be the Officer in Charge ("OIC") of the shift. The OIC supervised the shift's police officers working on a particular shift.  The Chief of Police generates the OIC list.  In the summer, the police department would take a sergeant off his normal shift so that he could conduct administrative activities.

Additionally, Plaintiff testified to the following.  An OIC would replace the sergeant for the entire summer.  During a regular shift, an OIC would patrol the borough in a police cruiser and, if the shift was busy, the OIC would supervise officers generating paperwork at police headquarters.  The OIC would also review police reports, arrange for the processing and transportation of prisoners, and was responsible for releasing property.  The OIC briefed officers on the patrol shift of any general orders that were handed down the chain of command and was responsible for investigating and recommending discipline and evaluating the officers that were assigned to his or her squad.  Plaintiff further testified that starting in 1995 or 1996, Plaintiff was placed on the OIC list.

In addition to being placed on the OIC list, Plaintiff's duties included reviewing traffic accident reports, and he was the Drunk Driving Coordinator.  Plaintiff also trained at least one new Belmar Police Officer, where his duties included riding with the new officer.  Furthermore, Plaintiff reviewed jail inspections, reviewed jail logs, and ensured that portable radios functioned properly.  Hill described Plaintiff as the "informal leader within the department."  Hill also testified, "[t]he easiest decision I could have made would be to promote Mark, to recommend a promotion of Mark Walsifer."  In a letter dated August 2, 2002, Hill stated:

> From conversations with his Supervisor, it is clear that PO Walsifer is at the cusp of achieving professional excellence.  Some areas still need to be addressed and improved, such as speeding enforcement and officer initiated activity; however, he shows great promise. Because of his performance and maturity, he was selected to be an Officer in Charge of a shift during the summer months.  In this position as Officer in Charge he continues to display a good sense of responsibility and bringing [sic] his shift within the parameters of Departmental expectations.

At the time Hill wrote the above evaluation, the Sergeant List had not been made known to him.

Cox was placed in the Detective Bureau in 1994 until his promotion to sergeant in 2003. Christopher Lynch testified in regard to Cox as follows:

> Q.   Do you recall if prior to his promotion to sergeant Tom Cox ever acted in a supervisory capacity?
>
> A.   He was in the detective bureau for like eight or nine years, so I would have to say I guess not.

Hill testified that Plaintiff had more seniority than Cox because he is a badge above.

**I.  New Table of Organization**

On January 28, 2004, the Borough implemented a new "Table of Organization" for the

11

Department.  In the Spring of 2004, Sergeant Palmisano ("Palmisano") was Plaintiff's squad

sergeant.  In April 2004, Palmisano was promoted from sergeant to lieutenant.  Palmisano's

promotion left a vacancy at the sergeant position.  From April 2004 to June 2005, Hill ordered

Plaintiff to serve as OIC of the squad.  If the vacant sergeant slot was filled, the Borough would

have  had to use the Sergeant List in which Plaintiff was ranked number two.  The Department

did not fill the vacant sergeant slot.

### III. <u>DISCUSSION</u>

**A.  <u>Standard of Review</u>**

Summary judgment is appropriate when the record "show[s] that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party,"  <u>See</u>, <u>e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the

applicable rule of law.  <u>Id.</u>  Disputes over irrelevant or unnecessary facts will not preclude a grant

of summary judgment.  <u>Id.</u>  In deciding whether there is a disputed issue of material fact, the

court must view the evidence in favor of the nonmoving party by extending any reasonable

favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be

believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  <u>Hunt v.

Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson</u>, 477 U.S. at 255).

**B.  <u>Count One- Retaliation for Asserting First Amendment Rights</u>**

In Count One of the Complaint, Plaintiff claims that Defendants' actions after the July 17,

2002 Stipulation of Settlement was entered into were in retaliation for Plaintiff's exercise of his right to freedom of speech, association, and the right to petition the government for the redress of grievances.  Plaintiff asserts that these actions were in violation of his rights under the First and Fourteenth Amendments of the United States Constitution and seeks relief under 42 U.S.C. § 1983.  Plaintiff alleges that Defendants' actions were "taken pursuant to an official and extant policy and practice of the Borough and the Department, and were taken by Hill and Lynch, individuals with final policymaking authority over such actions."  (Compl. ¶ 30).  Additionally, Plaintiff alleges that the "violations of law were overseen by Hill and Lynch, who ratified such violations by Defendants' action, which were retaliatory and violations of law, and being in a position to stop the Defendants' illegal behavior, Hill and Lynch failed to take any remedial action."  ( Compl. ¶ 31).

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001).  A public employee's retaliation claim for engaging in protected activity  is evaluated under a three-step process.  Id.; Green v. Phila. Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997); Pro v.

Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  First, the plaintiff must establish that the activity in question was protected.  Baldassare, 250 F.3d at 195.  "For this purpose, the speech must involve a matter of public concern."  Id.  Second, if the former requirement is met, plaintiff "must demonstrate that his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees."  Id.  These two determinations are questions of law for the court.  Id.

Third, if the those criteria are met, "plaintiff must then show the protected activity was a substantial factor in the alleged retaliatory action."  Id.  However, "the public employer can rebut the claim by demonstrating 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

1.  A Matter of Public Concern

"A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.'"  Id. (quoting Green, 105 F.3d at 885-86).  The focus is on the content, form, and context of the activity.  Id.  "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'"  Id. (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)).  However, "[a]lthough a plaintiff alleging a retaliation claim for protected speech under § 1983 must ordinarily establish that his/her speech was a matter of public concern to qualify for the protections of the First Amendment's guarantee of free expression, the same is not true where the

14

speech itself constitutes the plaintiff's lawsuit."  Brennan v. Norton, 350 F.3d 399, 417 (3d Cir.

2003) (citing San Filippo v. Bongiovanni, 30 F.3d 424, 434-35 (3d Cir. 1994)).  "On the

contrary, a plaintiff need only show that his/her lawsuit was not frivolous in order to make out a

prima facie claim for retaliation under the Petition Clause."  Id.  As the Third Circuit Court of

Appeals has stated:

> [w]hen government-federal or state-formally adopts a mechanism for
> redress of those grievances for which government is allegedly
> accountable, it would seem to undermine the Constitution's vital
> purposes to hold that one who in good faith files an arguably
> meritorious "petition" invoking that mechanism may be disciplined
> for such invocation by the very government that in compliance with
> the petition clause has given the particular mechanism its
> constitutional imprimatur.

San Filippo, 30 F.3d at 442.

Here, Plaintiff contends that he "exercised his right to freedom of speech and his right to

petition for the redress of grievances by way of filing the previous lawsuit."  (Pl.'s Br. in Supp. of

Mot. for Summ. J. 18).  Because this aspect of Plaintiff's First Amendment claim is based on a

previous lawsuit brought against the Defendants, Plaintiff need not establish that his speech was

a matter of public concern.

Plaintiff further claims his "right to association is implicated by his political activities

within the Republican party and his position as a member of the Belmar Board of Education."

(Id. at 19).  Because Plaintiff's associations relate to political and social concerns of the

community, they are a matter of public concern.

   2.  The Balance of Harm

_____In the second step of the process, plaintiff "must demonstrate that his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." Baldassare, 250 F.3d at 195.  "Courts must balance the speaker's First Amendment interest against any injury the public employer may suffer as a result of that expression." Brennan, 350 F.3d at 413.  This court "must consider the nature of the relationship between the employee and the employer as well as any disruption the employee's speech may cause, including the impact of the speech on the employer's ability to maintain discipline and relationships in the work place." Id.  "However, the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace." Id. at 414.

In their briefs, neither Plaintiff or Defendants have addressed this step.  Because the court finds that Plaintiff has an important First Amendment interest and that there is no evidence that these interests have disrupted the work place, the balance of harm weighs in favor of Plaintiff.

3.  Causation

_____In the third step of the process, plaintiff must "show the protected activity was a substantial factor in the alleged retaliatory action."  Baldassare, 250 F.3d at 195.  "[T]he public employer can rebut the claim by demonstrating 'it would have reached the same decision . . . even in the absence of the protected conduct.'" Id.  "This latter causation raises an issue of fact that must be resolved by the fact finder." Brennan, 350 F.3d at 414.  Furthermore,

> "[d]etermining whether a plaintiff's First Amendment rights were
> adversely affected by retaliatory conduct is a fact intensive inquiry
> focusing on the status of the speaker, the status of the retaliator, the
> relationship between the speaker and the retaliator, *and the nature of*

16

> *the retaliatory acts."*  Consequently, "[t]o properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial." A public employer "adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights."  "On the other hand, courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands."

Id. at 419 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)).

Plaintiff claims that Defendants' failure to promote Plaintiff to sergeant is a retaliatory act against Plaintiff for asserting his First Amendment rights.  In support of his argument, Plaintiff points to the following as evidence of Defendants' discriminatory intent: (1) violation of the terms of the Stipulation of Settlement[6]; (2) Hill's October 21, 2002 letter to the Monmouth County Prosecutor's Office regarding Plaintiff's position on the Belmar Board of Education; (3) the December 3, 2002 disciplinary action for "politicking" on duty and for failing to report his unit location; (4) failure to select Plaintiff for a two-week training seminar; and (5)  Plaintiff being the best candidate for the sergeant position.

## A.  The Letter to the Prosecutor's Office

On October 21, 2002, Hill forwarded a letter to the Monmouth County Prosecutor stating that the Department had a police officer who currently holds an elected position on Belmar's Board of Education and requesting that the Prosecutor make a determination as to whether the

---

[6]This is addressed in Subpart "D" of the opinion which addresses Count Three of the Complaint.

elected position posed a conflict of interest in violation of the Attorney General's Model Rules and Regulations.  In that letter, Hill stated, "I personally believe that police officers involved in local political activities is detrimental to the good order and conduct of the Police Department and therefore should be restricted."  Although Hill was the President of the Democratic Club, he did not mention that in his letter.  Responding to the letter, Assistant Prosecutor Richard Incremona stated that Plaintiff's position did not violate any laws or policies.

Defendants argue that because the letter merely asks for clarification of the Attorney General's Guidelines and because Defendants took no action against Plaintiff, the letter was not evidence of retaliation.  Plaintiff claims that "the letter is relevant as to Hill's state of mind . . ." (Pl.'s Br. in Reply to Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. 10).  Because Plaintiff has not presented any evidence that this inquiry to the Monmouth County Prosecutor was anything other than legitimate, he has not demonstrated any retaliatory intent or injurious effect.

### B.  The Discipline for Politicking

On December 3, 2002, Hill issued a Preliminary Notice of Disciplinary Action for "politicking" on duty and for failing to report his unit location.  The matter was arbitrated and the arbitrator found that Plaintiff's action warranted discipline.  Although the Preliminary Notice of Disciplinary Action sought a ten-day suspension, Plaintiff only received counseling and a written reprimand.

Plaintiff argues that the Internal Affairs investigation permits an inference that Defendants' actions were politically motivated.  However, Plaintiff has not produced any evidence that Plaintiff did not in fact commit the offense.  Because Plaintiff's actions warranted

discipline, as demonstrated by the findings of the arbitrator, Plaintiff's argument that the discipline is evidence of discriminatory intent is without merit.

### C.   The Two-Week Training Seminar

Plaintiff claims that in January 2003, he was scheduled to attend a two-week training seminar.  Plaintiff contends that although other officers were allowed to attend a similar training seminar, Plaintiff was denied access to this training course.  However, Plaintiff has not presented any evidence that there was any retaliatory intent by Defendants.

### D.   Plaintiff's Alleged Superiority

Plaintiff argues that Hill decided to promote Cox even though Plaintiff was essentially performing his job as a *de facto* sergeant.  He claims that Cox, however, had almost no supervisory experience.  Plaintiff further claims that since April 2004, Plaintiff was not promoted to sergeant, even though he was ranked second on the Sergeant List.  Plaintiff contends that he was nonetheless ordered to serve for approximately a year as the *de facto* sergeant without the sergeant's rank.

Defendants argue, however, that Plaintiff was not promoted because he was not the best candidate for the position.  Defendants contend that Plaintiff did poorly in his interview, did not have a bachelor's degree, and had a disciplinary record.  Defendants maintain that Cox, on the other hand, interviewed well, had a bachelor's degree, and did not have a disciplinary record.  Further, the two councilmen who interviewed the candidates found that Plaintiff did not interview well and that Cox was highly articulate and was clearly the superior candidate.

Although there is evidence that Plaintiff was qualified for the position of sergeant, there

19

is no evidence that shows that Cox was not qualified for the position as well or that Plaintiff's

political action or prior lawsuit had anything to do with the decision.

### E.  Plaintiff's Other Contentions Regarding His Non-Promotion

Plaintiff contends that a series of events preceding the promotion decision is also

evidence of retaliatory intent.  Those events are as follows.  A few days after a July 1, 2003 golf

game involving Lynch, Hill, Cox, and Retired Captain Larry Winter, the test scores for the

Sergeant List were adjusted, which, according to Plaintiff, resulted in Cox being tied for third.

Days after the golf game, Hill wrote two letters to Plaintiff dated July 3, 2003 and July 9, 2003

regarding Plaintiff's supervision of his shift, which were placed in his personnel file.  Although

these events occurred prior to the promotion decision, Plaintiff has not presented any evidence

that they were retaliatory or had any relationship to DOP's adjusting the Sergeant List scores or

the promotion recommendations and decision.

Although Plaintiff has raised multiple incidents that in his view were retaliatory in nature

and ultimately resulted in his failure to be promoted to sergeant, he has failed to produce

evidence that the protected activity (the prior lawsuit and his political affiliation and membership

on the Board of Education) was a substantial factor in the alleged retaliatory action.  Therefore,

summary judgment as to Count One will be granted in favor of Defendants, and Count One will

be dismissed.

### C.  **Count Two- Violation of Plaintiff's Equal Protection Rights**

To state an equal protection claim under the "class of one" theory announced in Village

of Willowbrook v. Olech, 528 U.S. 562 (2000), "a plaintiff must allege that (1) the defendant

treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 239 (3d Cir. 2006). _____

Plaintiff claims that Defendants have violated his equal protection rights.  Specifically, Plaintiff claims that his rights were violated in two instances.  First, Plaintiff claims that part of his December 2002  "politicking" discipline stemmed from a conversation with Cox.  Plaintiff claims that although both Plaintiff and Cox engaged in political conversation while on duty, only Plaintiff was disciplined.

The facts, however, show that Cox was not in fact similarly situated.  In that incident, the evidence shows that Plaintiff solicited Cox to register to vote by providing him with a voter registration form.  Although they may have had a discussion, the two were not similarly situated in terms of their actions.  Additionally, there is no evidence that any differing treatment was imposed intentionally.  Finally, because their acts were in fact different, there was a rational basis for the difference in treatment.

Second, Plaintiff claims he was treated differently from Sergeant Aker.  Plaintiff claims that although both officers were charged with "politicking", Aker's discipline was a written reprimand, whereas Defendants sought to suspend Plaintiff for ten days. _

_____Here, the evidence presented reveals that both officers received the same discipline as a result of their acts- a reprimand.  As they were not treated differently as a result of their actions, there was no equal protection violation.

**D. <u>Count Three- Breach of the Prior Settlement Agreement</u>**

Plaintiff alleges in Count Three that Defendants violated the terms of the Stipulation of Settlement. Specifically, Plaintiff contends that the Stipulation of Settlement was breached in four ways: (1) Defendants improperly considered previous disciplines when making promotional decisions; (2) Defendants improperly considered previous disciplines when imposing new disciplines; (3) Defendants failed to remove and expunge disciplines from Plaintiff's records; and (4) Defendants failed to employ the procedure mandated by the Stipulation of Settlement when imposing new discipline. The parties do not dispute that the Stipulation of Settlement is a binding contract.

    1. <u>Consideration of Disciplines in the Promotion</u>

Defendants, in their opposition brief to Plaintiffs motion and in their brief in support of their motion for summary judgment, argue that it is undisputed that three instances of discipline were considered by Hill when evaluating whom to promote: (1) a failure to supervise in October 2002; (2) a reprimand for politicking on duty decided in May 2003; and (3) another reprimand for failure to supervise his shift in July 2003.

Defendants fail to address the instance on which Plaintiff bases his claim. Plaintiff claims that Hill improperly used a discipline that occurred prior to the Stipulation of Settlement in his consideration for promoting Plaintiff to sergeant. Specifically, Plaintiff argues that Hill used a handicapped parking discipline which occurred on January 14, 2002, more than six months prior to the Stipulation of Settlement, in evaluating Plaintiff's weak points. Hill testified that he used this discipline with regard to Plaintiff's weak points.

Defendants argue that, "even if plaintiff's prior discipline could not be considered in the

promotional process, plaintiff has not demonstrated any damages as a result.  This is because the promotional decision would have been the same."  (Defs.' Br. in Supp. of Mot. for Summ. J. 33). Defendant points to the testimony of Szeliga and Manutti in support of their argument, in which both claimed that, among other things, Plaintiff didn't interview well.  Plaintiff claims, however, that this testimony is irrelevant, as Szeliga and Manutti did not meet with Hill after the interview to discuss who should be promoted.

### 2.  Consideration of Previous Disciplines when Imposing New Disciplines

Plaintiff alleges that Defendants used a discipline from May 2001 to sustain a disciplinary action involving "politicking" in 2002.  Plaintiff argues that Hill's reference to the May 2001 discipline in his November 5, 2002 report and subsequent Preliminary Notice of Disciplinary Action dated December 3, 2002, was a breach of the Stipulation of Settlement.  Additionally, Plaintiff asserts that "Defendants' consideration of pre-settlement discipline when imposing post-settlement discipline lead to damages when Plaintiff was denied the promotion to sergeant." (Pl.'s Br. in Reply to Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. 4).

Defendants acknowledge that Hill referred to the May 2001 discipline in the November 2002 report.  However, Defendants argue that "even if Chief Hill inadvertently referred to discipline from 2001 in his November 2002 report that he could not, there was no harm to Plaintiff and he suffered no damages."  (Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. 7). Defendants reason that because Plaintiff received the same discipline for both infractions, the former discipline could not be the basis for the latter.

### 3.  Failure to Remove and Expunge Disciplines from Plaintiff's Record

23

Plaintiff claims that Defendants' failure to physically remove Plaintiff's disciplines from his file violated the express terms of the Stipulation of Settlement.  Plaintiff further contends that even if the Stipulation of Settlement did not mandate the actual removal of the files, Defendants violated the terms under their own interpretation, as they used the pre-settlement discipline for the purposes of future discipline and promotions.

Defendants argue that they have not violated the Stipulation of Settlement by retaining Plaintiff's disciplinary records for two reasons.  First, Defendants maintain that the Stipulation of Settlement does not state or require that Internal Affairs files involving Plaintiff must be destroyed.  Second, Defendants argue that "although the Stipulation uses the phrase 'removed and expunged', it contains a qualifying provision, which is that the disciplinary files are to be removed and expunged for the purpose of future discipline, promotion or career advancement." (Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. 8).

State law governs the construction and enforcement of settlement agreements in this Court. Excelsior Ins. Co. v. Pennsbury Pain Center 975 F. Supp. 342, 348-49 (D.N.J. 1996).  Under New Jersey law, "when the terms of a contract are clear and unambiguous, there is no room for construction and the court must enforce those terms as written."  Watson v. City of East Orange 175 N.J. 442, 447 (2003).  Thus whether Defendants have complied with this provision of the Stipulation of Settlement must be determined under state law.

4.  The Procedure When Imposing New Discipline

Plaintiff asserts that Defendants further violated the Stipulation of Settlement by failing to employ the procedure mandated when imposing new discipline.  The Stipulation of Settlement

provides in pertinent part:

> At any time while Richard T. Lynch is employed by or in any way associated with the Borough of Belmar in any capacity through employment or appointment, in any capacity, any disciplinary action commenced against Mark or Nicholas Walsifer will be held in a Departmental hearing conducted before an American Arbitration Association Arbitrator chosen in agreement between the Borough Police Department and either Mark or Nicholas Walsifer.  The Arbitrator's decision, if determining that discipline is warranted shall then be fully appealable either through contract and/or the Administrative Codes as determined by the nature of the discipline.

Plaintiff asserts that Defendants violated this provision on two occasions.  Plaintiff argues that Hill's letters dated July 3, 2003 and July 9, 2003 reprimanding Plaintiff were placed in Plaintiff's personnel file and that neither matter was brought before an arbitrator.  Plaintiff contends that Defendants therefore failed to apply the procedures set forth in the Stipulation of Settlement.

Defendants argue that since Plaintiff did not request a hearing on the reprimands, there was no violation of the Stipulation of Settlement.  Defendants state that because of the absence of a request by Plaintiff for a panel of arbitrators, the Borough assumed he was accepting the discipline.

5.  <u>Breach of the Prior Settlement Agreement as a Violation of 42 U.S.C. § 1983</u>

Plaintiff claims that Defendants' breach of the Stipulation of Settlement is a violation of Plaintiff's civil rights under 42 U.S.C. § 1983.  Plaintiff argues that the basis for his § 1983 claim is two-fold.  First, Plaintiff argues that "the Stipulation of Settlement was entered into by the parties to resolve a previously filed federal lawsuit which involved a claim that Defendants violated Plaintiff's First Amendment rights under § 1983."  (Pl.'s Br. in Reply to Defs.' Br. in

Opp'n to Pl.'s Mot. for Summ. J. 7).  Second, Plaintiff contends that "Defendants breached the

Stipulation of Settlement because of Plaintiff's political affiliation, because he engaged in

protected speech, and because he attempted to redress his grievance through the judicial

process."  (Id.).

Defendants maintain that Plaintiff's claim is not cognizable under 42 U.S.C. § 1983.

Defendants argue that "[a]n allegation that a party breached a court-approved settlement

agreement does not form the basis for a section 1983 claim."  (Defs.' Br. in Opp'n to Pl.'s Mot.

for Summ. J. 10-11).  Defendants state that "[t]his is so because § 1983 provides a cause of

action only for deprivation of constitutional or statutory rights, not those that arise by contract."

(Id.).

Plaintiff has the burden of establishing liability under Section 1983.  Reichley v.

Pennsylvania Dep't of Agric., 427 F.3d 236, 244 (3d Cir. 2005).  Additionally, "there can be no

cause of action under § 1983 absent violation of a right secured by the Constitution or the laws of

the United States."  Id.

As stated above, state law governs the enforcement of settlement agreements.  Plaintiff

states, in a conclusory manner, that: (1) the Stipulation of Settlement was entered into by the

parties to resolve a previous lawsuit involving a § 1983 claim; and (2) there is evidence to

support his theory that Defendants breached the Stipulation of Settlement because of Plaintiff's

political affiliation, because he engaged in protected speech, and because he attempted to redress

his grievance through the judicial process.  Even assuming Plaintiff has established that

Defendants breached the Stipulation of Settlement, he has not presented any evidence or cited

any case law to support his assertion that the breach was in violation of his civil rights under 42

U.S.C. § 1983.  Therefore, summary judgment on his claim for breach of the Stipulation of

Settlement under 42 U.S.C. § 1983 will be granted for Defendants and that claim will be

dismissed.

**E.  Liability of Each Defendant on Federal Claims**

Addressing each Defendant individually, it is apparent that none can be held liable on the

§ 1983 claims.

1.  Borough of Belmar

Even assuming that Plaintiff's Constitutional claims were valid, the Borough as a

municipality would not be liable for not promoting Plaintiff.  That is because the Borough cannot

be held vicariously liable in a suit under § 1983.  Brennan, 350 F.3d at 427 (citing Monell v. New

York City Dept. of Soc. Servs., 436 U.S. 658 (1978)).

The court in Brennan explained that liability could attach in three different ways.  First,

the court stated:

> [a] municipality can be sued directly under § 1983 if it is alleged to
> have caused a constitutional tort through a policy, ordinance,
> regulation or officially adopted decision that has been promulgated by
> the municipality's officers.   Liability also attaches for a
> municipality's constitutional violations resulting from governmental
> custom even though such custom has not been formally approved via
> the official decision making channels.

Id. (citing Monell, 436 U.S. at 690-91).

Here, just as in Brennan, Plaintiff does not attempt to base the Borough's liability upon a

policy or custom.  Id.

Second, "municipal liability may . . . exist where authorized policymakers approve a

subordinate's decision and the basis for it."  Id.  Again, as in Brennan, Plaintiff did not establish

any basis for the conclusion that the Mayor or the Borough Council approved of any alleged retaliatory motivation.

Third, liability can exist where "an unconstitutional policy could be inferred  from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." Id. (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)). "However, if a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983." Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)).

Here, because as part of the promotional process Hill recommended a candidate for promotion and the Mayor and Borough Council voted on the nomination, Hill was not a policymaker for purposes of imposing municipal liability under § 1983.  Therefore, the Borough cannot be liable under § 1983 as a matter of law.

2.  Borough of Belmar Police Department

The Third Circuit treats the municipality and its police department as a single entity for purposes of § 1983 liability.  Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997). Accordingly, the Borough of Belmar Police Department cannot be liable under § 1983.

3.  Richard Lynch

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through  allegations of personal direction or of actual knowledge and acquiescence." Id.

Plaintiff claims the following in support of his claim that Lynch was involved in the alleged retaliatory acts: (1) Lynch was the Belmar Chief of Police and in Hill's chain of command at the time the "politicking" discipline and the July 2003 disciplines were issued against Plaintiff; (2) as the Borough Administrator, Lynch oversaw the day-to-day functions of the Borough, including personnel decisions and was made aware of plaintiff's placement on the Sergeant List; (3) there is documentary evidence that Hill sent a letter dated August 7, 2003 to Richard Lynch stating, "I am requesting that we discuss this promotion in closed session on August 13, 2003"; and (4) there is testimony that Lynch actively participated in the promotion process in order to prevent Plaintiff from being promoted.

Addressing each piece of "evidence" individually, it is clear that Plaintiff's claim against Lynch is without merit.  First, the fact that Lynch was the police chief at the time of certain disciplines does not show personal involvement, and in addition, there is no evidence that the disciplines were not legitimate.  Second, although there was testimony that Lynch oversaw the day-to-day functions of the Borough, is in charge of personnel under that "umbrella", and was aware of the Sergeant List, there is no evidence that Lynch was personally involved in any retaliatory act.  Third, the August 7, 2003 letter was not addressed to Lynch but to the Mayor and Borough Council.  The letter merely copied Lynch, who was the Chief of Police at that time and does not show that Lynch was personally involved in the alleged acts of retaliation.  Fourth, the testimony that Plaintiff refers to in support of his contention that Lynch actively participated in the promotion process in order to prevent Plaintiff from being promoted, came from Plaintiff. The testimony was as follows:

Q.     Well again, what people were talking?  Townspeople?

A.   The people that work in the borough, borough employees.  You hear it from all over. You are a police officer, so you deal with a lot of people and – I mean, it's like Councilman Manutti.  One right after – right after the – right after the interview process I – I believe it was down at the marina I saw him and he comes up and said to me something like they're having a tough time with you, and he referred to Dick Lynch not wanting – never wanting to promote me, and he said – he said to me something like just hang in there.  You know, so I mean you get – I knew exactly what he was talking about. He didn't come right out and say hey, they're never going to promote you because they don't like your political activities, you're fighting the mayor constantly or – not that I'm fighting the mayor, that I support different candidates than the mayor would like.  Did they actually come out and tell me that?  No.  They don't tell me that, but those are the kind of things.

This testimony by Plaintiff is a hearsay statement regarding the alleged views of Lynch.  This testimony is not evidence of any retaliatory acts by Lynch.

In sum, because there is no evidence of any personal involvement by Lynch in the acts alleged by Plaintiff, Lynch cannot be held liable under § 1983.

### IV.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment will be granted as to Count One and Count Two.  Defendants' motion for summary judgment will be granted as to the federal claim of Count Three.

There remains only the state law contract claim regarding the Stipulation of Settlement. The court did not reserve jurisdiction in the Stipulation of Settlement to enforce it.  Because important considerations of municipal governance and law are involved, it is particularly appropriate that this aspect of the case be decided by state courts.  Therefore, the court will exercise its discretion under 28 U.S.C. § 1367(c)(3) and dismiss the remainder of the action without prejudice.  The court will enter an order implementing this opinion.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:          October 12, 2006